UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Christopher Ivey and Eugene Banks, | CASE NO. 18-cv-1429 (PAM/DTS) |
| Plaintiffs, | |
| v. | **REPORT AND RECOMMENDATION** |
| Nancy Johnston, | |
| Defendant. | |

Christopher Ivey and Eugene Banks, 1111 Highway 73, Moose Lake, Minnesota 55767, *pro se* Plaintiffs.

James H. Clark III, Office of the Attorney General for the State of Minnesota, 445 Minnesota Street, Suite 1100, St. Paul, Minnesota 55101, for Defendant.

## INTRODUCTION

Plaintiffs Christopher Ivey and Eugene Banks, civilly committed residents of the Minnesota Sex Offender Program ("MSOP"), bring the present lawsuit under 42 U.S.C. § 1983 challenging two MSOP practices they argue violate their free speech rights under the United States and Minnesota constitutions. Defendant Nancy Johnston, the Executive Director of MSOP, moves to dismiss the lawsuit. The court concludes that the state constitutional claims, the claims against Johnston in her personal capacity, and Plaintiff Banks must be dismissed. However, Plaintiff Ivey has sufficiently pleaded claims under the First Amendment to survive dismissal under Rule 12(b)(6).

## FINDINGS OF FACT[1]

Plaintiffs Ivey and Banks are civil detainees, committed to MSOP pursuant to Minnesota law as being either sexually dangerous persons, having a "sexual psychopathic personality," or both. Compl. ¶ 2, Docket No. 1; Minn. Stat. § 253D.02, subds. 15-16. MSOP is a program of the Minnesota Department of Human Services. Compl. ¶ 3. Ivey and Banks reside at the MSOP facility in Moose Lake, Minnesota. *Id.* at ¶ 2. Although both Plaintiffs previously served prison sentences, neither is still subject to any continued limitations to their civil rights stemming from the prior criminal convictions. *Id.* at ¶10. For instance, both Plaintiffs have voted while committed to MSOP, and Banks has run for mayor of Moose Lake. *Id.* at 11-12; Aff. of Eugene Banks in Supp. of Compl. ¶ 4, Docket No.3.[2] Defendant Johnston is the current Executive Director of MSOP. *Id.* at ¶ 3. Plaintiffs bring this action against Johnston in both her official and individual capacity. *Id.*

---

[1] As it must, the Court accepts as true the well-pleaded factual allegations from Plaintiffs' Complaint, the gist of which are set forth below. The Court need not, and does not, accept as true any conclusory allegations and legal conclusions Plaintiffs state in their Complaint. *Silver v. H&R Block, Inc.*, 105 F.3d 394, 397 (8th Cir. 1997).

[2] Because the Complaint references Banks's Affidavit, which was filed contemporaneously with the Complaint, the Court is satisfied that any factual allegations contained within it are sufficiently embraced by the Complaint so as not to require converting this matter into a motion for summary judgment. *See, e.g., United Steel, Paper and Forestry, Rubber, Mfg., Energy, Allied Indus. and Serv. Workers Int'l Union, AFL-CIO, CLC v. Carlisle Power Transmission Prods., Inc.*, 489 F. Supp. 2d 924, 928 (D. Minn. 2007). However, Defendant's brief in support of her motion provides a factual background of both Plaintiffs' criminal history and commitment to MSOP. Mem. L. Supp. Def.'s Mot. Dismiss Pl.'s Compl. (hereinafter "Def.'s Mem.") 3-5, Docket No. 20, which are neither embraced by the pleadings nor relevant to any jurisdictional analysis. This recitation serves no apparent role other than to attempt to prejudice the Court.

MSOP does not allow Plaintiffs or any resident access to the internet, except in rare and seemingly unconfirmed instances involving provisional discharge from the Program. *Id.* at ¶ 6. However, according to a written response by MSOP administration, even this is apparently not the case. *Id.* MSOP does provide civilly committed residents use of computers, but blocks access to the internet and e-mail programs on those computers. *Id.* at ¶ 19. Because of this ban on internet access, Plaintiffs cannot view websites such as Twitter, which President Trump has stated is a preferred medium for communicating with the public. *Id.* at ¶¶ 16-17. The Moose Lake facility already has servers and internet, which are currently utilized by MSOP staff. *Id.* at ¶ 19. Further, content filters and other commercials tools exist and are currently used by government agencies, schools, and public libraries. *Id.*

MSOP also has a practice of blocking access to certain television stations provided by Mediacom, the Moose Lake facility's cable provider, as part of the current cable package. *Id.* at ¶¶ 20, 22. Specifically, Plaintiffs allege that they do not receive "PBS 2, MN Channel, C-SPAN 3, [or] the local access channel carried by Mediacom." *Id.* at ¶ 20. Mediacom is required to carry all local broadcast stations, as well as provide at least one public access channel. *Id.* If not blocked by MSOP, Mediacom would provide these channels as part of the current subscription package at no additional cost. *Id.* at ¶ 22. Thus, although Mediacom carries these channels, MSOP affirmatively blocks Plaintiffs' access to them, despite allowing them access to all other channels in the Mediacom package. *Id.*

Ivey and Banks brought the present lawsuit in May 2018, arguing that the aforementioned policies violate their rights under both the United States and Minnesota

constitutions. *Id.* at ¶¶ 25-32. They seek a declaration that Johnston's policies against internet and cable TV access violate their rights and an injunction prohibiting continued enforcement of these polices. *Id.* at ¶¶ 33-35. They also seek nominal damages against Johnston in her individual capacity. *Id.* at ¶ 36.

## CONCLUSIONS OF LAW

Johnston moves to dismiss Plaintiffs' Complaint, asserting the following legal bases: (1) there is no private cause of action under the Minnesota Constitution; (2) Plaintiffs fail to state a claim for which relief can be granted under the First Amendment; (3) Banks is barred from re-litigating either of his First Amendment claims; and (4) Johnston is entitled to qualified immunity in her individual capacity. If Johnston is correct regarding the first two grounds, Plaintiffs' entire lawsuit must be dismissed. The Court thus considers each of the four grounds for dismissal in turn.

## I.    Legal Standards

A motion to dismiss under Rule 12(b)(6) tests the facial plausibility of a complaint. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and 'that a recovery is very remote and unlikely.'" *Id.* at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). A court considering dismissal under 12(b)(6) examines whether a complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). Although it must accept all factual content in a complaint as true, a court may ignore "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Id.* "Though pro se complaints are to be

4

construed liberally, they still must allege sufficient facts to support the claims advanced." *Stone v. Harry*, 364 F.3d 912, 914 (8th Cir. 2004) (internal citation omitted).

In deciding a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction, a court may consider the entire record and is not limited to the pleadings. *Osborn v. United States*, 918 F.2d 724, 728-29 (8th Cir. 1990). When a jurisdictional question exists, the "court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.* at 730 (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). The plaintiff's allegations are not entitled to a presumption of truthfulness, and the existence of disputed material facts does not preclude a court from deciding the jurisdictional issue. *Id.* The burden of proof that jurisdiction exists remains with the plaintiff. *Id.*

## II.    Plaintiffs' State Constitutional Claims

Ivey and Banks assert that Johnston's policies blocking internet and specific cable channels violate their free speech rights under the Minnesota Constitution. To the extent they assert these claims against Johnston in her official capacity, this Court lacks subject matter jurisdiction. "The requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States and is inflexible and without exception." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (internal quotations omitted). The Eleventh Amendment "bars a suit against state officials when the state is the real, substantial party in interest." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) (internal quotation omitted). "This constitutional bar

applies to pendent claims as well."[3] *Id.* at 120. Plaintiffs have not alleged, much less demonstrated, that Minnesota has waived its sovereign immunity in the present case. By suing Johnston in her official capacity, Ivey and Banks clearly intended that MSOP, a state entity, would be enjoined from continuing the conduct that aggrieves them. *See id.* at 123-24 (finding an injunction against state and county officials to alter conditions at a state facility was substantially relief against the state itself). The Eleventh Amendment prohibits such a suit, so Plaintiffs' state law claims against Johnston in her official capacity are dismissed.

As to any state constitutional claim that may remain against Johnston in her individual capacity, "there is no private cause of action for violations of the Minnesota Constitution." *E.g.*, *Eggenberger v. West Albany Twp.*, 820 F.3d 938, 941 (8th Cir. 2016) (quoting *Guite v. Wright*, 976 F. Supp. 866, 871 (D. Minn. 1997)). Taking all of Plaintiffs' allegations as true, they fail to state a claim as a matter of law. Accordingly, Plaintiffs' claims arising under the Minnesota Constitution are dismissed in their entirety.[4]

## III. Plaintiffs' First Amendment Claims

Ivey and Banks further allege—and federal jurisdiction over this case is premised upon the claim—that Johnston's conduct violates their free speech rights under the First

---

[3] The well-known exception to this jurisdictional bar is a suit challenging the federal constitutionality of a state official's action which solely seeks prospective relief. *Ex parte Young*, 209 U.S. 123, 155-56 (1908); *Calzone v. Hawley*, 866 F.3d 866, 869 (8th Cir. 2017) ("A suit for injunctive or declaratory relief avoids [Eleventh Amendment] immunity if the official has some connection to the enforcement of the challenged laws."). This exception is relevant to Plaintiffs' federal claims.

[4] Plaintiffs' Complaint also references the Minnesota Constitution's provision regarding voter eligibility. Minn. Const. art. VII, § 1. To the extent that Plaintiffs intended to raise a separate claim under that provision, the claim would fail for the same reasons articulated above.

Amendment to the United States Constitution.[5] To state a viable § 1983 claim, "a plaintiff must show that he was deprived of a right secured by the Constitution . . . and that the deprivation was committed by a person acting under color of state law." *Alexander v. Hedback*, 718 F.3d 762, 765 (8th Cir. 2013). A plaintiff must also plead facts showing each defendant's personal involvement in the alleged deprivation. *Ellis v. Norris*, 179 F.3d 1078, 1079 (8th Cir. 1999).

Johnston's argument for dismissing Plaintiffs' First Amendment claims is a narrow one. She does not argue that Plaintiffs failed to plead her personal involvement in any of the alleged conduct, or that she was not acting under the color of state law. Nor does she contend that, even if Plaintiffs have the particular rights at issue, they've failed to plead conduct showing a violation of such a right. Rather, Johnston argues Plaintiffs have failed to state a viable claim because Plaintiffs, as MSOP clients, do not have a constitutionally protected "right to use the internet" or "to watch any specific television channel." Def.'s Mem. 11, 13. For the reasons stated below, this argument fails at the pleading stage.

---

[5] Plaintiffs also apparently argue that Johnston's actions violate the "right to be an informed electorate," which they claim is inherent to their right to vote and protected by the First Amendment. Compl. ¶ 27. It is unclear whether they intended this argument to constitute a freestanding claim. To the extent they do, the claim fails as a matter of law. The Constitution does not specifically recognize a right to vote for any office, but rather restricts a state from treating its electorate in an arbitrary or disparate manner. *E.g.*, *Bush v. Gore*, 531 U.S. 98, 104-05 (2000). Moreover, the cases Plaintiffs contend show a right to be an informed voter all proceed on other constitutional grounds. *See Capital Cities Media, Inc. v. Chester*, 797 F.2d 1164 (3d Cir. 1986) (First Amendment free speech and press); *Averill v. City of Seattle*, 325 F. Supp. 2d 1173 (W.D. Wash. 2004) (freedom of association); *Joseph v. City of Birmingham*, 510 F. Supp. 1319 (E.D. Mich. 1981) (Fourteenth amendment challenge to residency requirement).

### A.    Internet

In their Complaint, Ivey and Banks allege that Johnston, the current Executive Director of MSOP, has crafted and enforces an unwritten policy denying all civilly committed residents of MSOP any access to the internet. Johnston does not deny this as a factual matter. Rather, citing cases from this District, she contends that it is "well settled" law that "MSOP clients have no constitutionally protected right to use the internet." Def.'s Mem. 11. But there is no binding precedent that forecloses the present claim at the pleading stage and this Court does not have a sufficiently developed record to consider dismissal on the basis Johnston asserts.

### 1.    First amendment and the internet

The mere fact that the speech Plaintiffs seek to access is on the internet does not vitiate their free speech claim. "The right of freedom of speech 'includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read' as well as 'freedom of inquiry' and 'freedom of thought.'" *Karsjens v. Jesson*, 6 F. Supp. 3d 916, 938-39 (D. Minn. 2014) (quoting *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965)); *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976) (explaining the First Amendment "protection afforded is to the communication, to its source and to its recipient both").

There has never been serious doubt that the First Amendment extends to speech distributed via the internet. In 1997, when the general public's use of the internet was still in its infancy, the Supreme Court struck down two provisions of the "Communications Decency Act of 1996" for being unconstitutionally overbroad. *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 858, 885 (1997). The provisions at issue made it a federal crime to

use a computer to knowingly send "obscene or indecent messages to any recipient under 18 years of age[,]" or knowingly send or display "patently offensive messages in a manner that is available to a person under 18 years of age." *Id.* at 859-60. Comparing the internet to television and radio, the Court determined that the internet was neither so invasive nor scarce a medium so as to warrant "qualifying the level of First Amendment scrutiny that should be applied to [it]." *Id.* at 867-70.

Recently, the Supreme Court reaffirmed this conclusion. In *Packingham v. North Carolina*, the Supreme Court struck down a North Carolina statute making it a felony for a registered sex offender "to access a commercial social networking Web site where the sex offender knows that the site permits minor children to become members or to create or maintain personal Web pages." 137 S. Ct. 1730, 1733 (2017) (quoting N.C. Gen. Stat. Ann. §§ 14-202.5(a), (e) (2015)). Both the five-justice majority and four-justice concurrence concluded that the statutory definition of a "commercial social networking Web site" was so overbroad that it could be read to include websites such as Amazon.com, WebMD, and the Washington Post. Thus, the ban failed under even a content-neutral standard. *Id.* at 1737; *id.* at 1739 (Alito, J., concurring). Although the Court agreed that the prevention of child exploitation is a significant governmental interest, "[t]he fatal problem for § 14-202.5 [was] that its wide sweep precludes access to a large number of websites that are most unlikely to facilitate the commission of a sex crime against a child." *Id.* at 1741 (Alito, J., concurring).

Because the First Amendment plainly protects speech distributed over the internet, Plaintiffs may maintain a § 1983 action by alleging sufficient facts showing a government actor deprived them of such speech. *Cf. Mainstream Loudoun v. Bd. of Tr. of Loudoun*

*Cty. Library*, 2 F. Supp. 2d 783, 793-97 (E.D. Va. 1998) (declining to dismiss First Amendment claims against library that placed content-based restrictions on computer web browsers). Plaintiffs have done so here by alleging that Johnston "prohibit[s] all internet access to Plaintiffs" at the MSOP facility where they reside. Compl. ¶ 6. Although they do not specifically allege how Johnston enforces this prohibition, they have alleged that they are civilly committed to MSOP. Based upon the nature of involuntary commitment, this Court may reasonably infer that Johnston maintains a sufficient level of control over Plaintiffs and their living conditions that allows her to effectuate an internet ban.

### 2.    Plaintiffs' civil commitment status and 'modified *Turner*'

Johnston suggests that, in fact, Plaintiffs' civil commitment status causes their claims to fail as a matter of law because, like the incarcerated, an involuntarily committed individual's "liberty interests are considerably less than those held by members of free society." *Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (2006). So, even if her conduct would normally violate the First Amendment, Johnston argues that Plaintiffs do not retain a sufficiently robust First Amendment right for her actions to constitute a constitutional violation against them. Still, the grounds of MSOP—Moose Lake, like prison walls, "do not form a barrier separating" the civilly committed "from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84 (1987). Because Plaintiffs retain at least a limited First Amendment right, their claim survives the motion to dismiss.

Johnston cites no binding precedent that forecloses Plaintiffs' claim, nor could this Court find such precedent. The two Eight Circuit cases Johnston cites cannot be read so broadly as to bar an MSOP resident from bringing First Amendment claims for internet

access. In *Senty-Haugen*, the Eighth Circuit considered the process due under the Fourteenth Amendment to an MSOP resident who was placed in isolation. In a footnote, and with no discussion, the court observed that the temporary deprivation of "access to the canteen and outside venders and computer privileges" while in isolation were "*de minimis* restrictions 'with which the Constitution is not concerned.'" 462 F.3d at 886 n. 7 (quoting *Bell v. Wolfish*, 441 U.S. 520, 539 n. 20 (1979)). And in *Hollie v. Ludeman*, a consolidated appeal, the Eighth Circuit affirmed dismissal of the complaint "for the reasons the district court stated." 450 F. App'x 555, 556 (8th Cir. 2012). The decision below, *Pyron v. Ludeman*, concerned computer privileges and limits on network storage, but not a ban on internet access. Civ. No. 10-3759 (PJS/JJG), 2011 WL 3290365, at *5 (D. Minn. July 29, 2011). The computer deprivations involved in *Senty-Haugen* and *Pyron* were not so sweeping in scope as the wholesale ban on internet access challenged here. *Senty-Haugen* involved a complete but temporary deprivation during a procedurally affirmed isolation, 462 F.3d at 892, and *Hollie/Pyron* concerned limits on network storage and the permissible mediums of data storage in the institutional setting. *Pyron*, 2011 WL 3290365, at *5. Thus, the Eighth Circuit precedent Johnston cites does not support the proposition that, as a matter of law, MSOP residents do not retain a constitutional right to access speech on the internet.

Without binding precedent, this Court is left to conduct its own analysis. To determine whether MSOP residents retain a particular constitutional right given their civil commitment, courts in this District have adopted a 'modified *Turner*' analysis. *Ivey v. Mooney*, Civ. No. 05-2666 (JRT/FLN), 2008 WL 4527792, at *4 (D. Minn. Sept. 30, 2008). In *Turner v. Safley*, the Supreme Court formulated "a standard of review for prisoners'

11

constitutional claims that is responsive both to the policy of judicial restraint regarding prisoner complaints and the need to protect constitutional rights." 482 U.S. at 85. A prison regulation may impinge upon an inmate's constitutional rights if it is "reasonably related to legitimate penological interests." *Id.* at 89. The district court in *Ivey*, seeking to apply *Turner*'s analytical framework to civil commitments, recognized that "penological interests" were not the appropriate consideration, and instead considered the challenged policy's reasonable relationship to legitimate therapeutic and institutional interests. *Ivey*, 2008 WL 4527792, at **4, 10. Since *Ivey*, this District has consistently used the modified *Turner* analysis in cases brought by MSOP residents.

Under this analytical framework, if a plaintiff's complaint states a cognizable First Amendment claim, it generally survives a motion to dismiss despite the plaintiff's civil commitment status. Applying *Turner* and determining the extent of First Amendment rights in the civil commitment context, like its penological counterpart, "is a fact-intensive universe." *Holloway v. Magness*, 666 F.3d 1076, 1079 (8th Cir. 2012). An individual plaintiff's therapy needs may be highly relevant to determining whether a policy reasonably relates to a legitimate interest. As such, courts considering a motion to dismiss an involuntarily committed individual's constitutional claim under Rule 12(b)(6) limit their inquiry to whether the Complaint states a cognizable constitutional claim and leave the *Turner* question to be determined upon a properly developed factual record. *See Stone v. Jesson*, Civ. No. 11-0951 (WMW/HB), 2017 WL 1050393, at *4 (D. Minn. Mar. 17, 2017); *Pittman v. Jesson*, Civ. No. 12-1410 (SRN/TNL), 2014 WL 4954286, at *16 (D. Minn. Sept. 30, 2014) (citing *Karsjens*, 6 F. Supp. 3d at 937). At least one court has conducted the modified *Turner* analysis on a Rule 12(b)(6) motion. But the court there

made it very clear that the plaintiffs had made sufficient allegations and attached enough material to the complaint that the court could consider the *Turner* factors on the pleadings. *Semler v. Ludeman*, Civ. No. 09-0732 (ADM/SRN), 2010 WL 145275, at **16 n. 8, 21 n. 9 (D. Minn. Jan. 8, 2010). As noted above, Plaintiffs here have stated a cognizable First Amendment claim and there is not a sufficient record at this stage for the Court to conclude that a wholesale restriction on internet access is sufficiently supported by institutional and therapeutic concerns.

The remaining precedent Johnston cites from this District does not alter this Court's conclusion that the claim survives dismissal at this early stage. In *Banks v. Jesson*, Civ. No. 11-1706 (MJD/JJK), 2012 WL 13094534 (D. Minn. Jan. 13, 2012), *R&R adopted by* 2016 WL 3566207 (D. Minn. June 27, 2016), the court considered a challenge to MSOP's internet ban. On a summary judgment motion, it applied the "modified *Turner*" analysis and upheld MSOP's internet ban, granting summary judgment to the defendants. It did so only after reviewing the evidence, including affidavits, submitted by both parties. *See Banks*, 2012 WL 13094534, at *10-11. Johnston's attempt to transform the court's decision in *Banks* into a blanket rule that a wholesale internet ban is *per se* reasonable for all MSOP residents in all circumstances is a bridge too far.[6]

Count 1 of Plaintiffs' Complaint states a cognizable claim for infringement of their First Amendment rights based upon Johnston's policy of denying them all internet access.

---

[6] It bears repeating here that Johnston has not argued that Plaintiffs' factual pleadings are deficient under *Twombly/Iqbal*, Rather, her argument is a blanket assertion that MSOP residents have no First Amendment right of access to the internet. It may well be that Plaintiffs have no cognizable First amendment claim, *but* that determination must await summary judgment.

### B. Television channels

For similar reasons, Plaintiffs' Complaint also states a First Amendment claim based upon Johnston's selective blocking of television channels. Johnston contends that "MSOP clients have no constitutionally protected right to watch any specific television channel." Def.'s Mem. 13. Again, the First Amendment's protection applies "to the communication, to its source and to its recipient both." *Va. State Bd. of Pharmacy*, 425 U.S. at 756. Television programming is speech protected by the First Amendment, and as such, government actions that either unduly burden or prohibit said speech may be unconstitutional. *See United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 811 (2000) (noting it is undisputed that, as it regards Playboy's television broadcasts, "adults have a constitutional right to view it . . . and Playboy has concomitant rights under the First Amendment to transmit it"); *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 636 (1994) ("There can be no disagreement on an initial premise: Cable programmers and cable operators engage in and transmit speech, and they are entitled to the protection of the speech and press provisions of the First Amendment.").

Johnston's sole argument that, as a matter of law, MSOP residents do not retain this particular First Amendment right stands on even less sure footing than her argument regarding the internet. She offers one case, *Banks v. Jesson*, Civ. No. 11-1706 (MJD/JJK), 2011 WL 6292133 (Nov. 3, 2011), *R&R adopted by* 2011 WL 6275960 (D. Minn. Dec. 15, 2011), to support her proposition. Besides not binding this Court, the reasoning in that case is not persuasive. There, the magistrate judge, citing a prisoner civil rights case from another district, concluded that "there is simply no constitutionally protected right in television watching[,]" and so recommended dismissing certain claims.

*Banks*, 2011 WL 6275960, at *2. In adopting the R&R, the District Court first noted that Banks's "liberty interests are considerably less than those held by members of free society." *Banks*, 2011 WL 6275960, at *1 (quoting *Senty-Haugen*, 462 F.3d at 886). It also suggested that any right to watch television would be a *de minims* restriction. *Id.*

This Court respectfully disagrees with that analysis of the issue. Although there has been little reason outside the prisoner civil rights context for courts to consider a "right to view television," the law is established that the content of television programming is, in fact, speech. The Supreme Court has taken seriously challenges to government actions impinging the speech rights of television programmers and broadcasters, and has stricken down such regulations. *E.g.*, *Playboy Entm't Grp.*, 529 U.S. 803; *Turner Broad. Sys.*, 512 U.S. 622. Given this precedent, courts should be wary to conclude too quickly that any concomitant right to receive these broadcasts does not exist or is merely *de minimis*. Because television broadcasts are protected speech, this Court is satisfied that, as a general proposition, Plaintiffs have alleged a cognizable First Amendment violation in Count 2 of their Complaint.

The question then becomes whether this particular First Amendment right is one that Plaintiffs retain as civilly committed residents of the MSOP.[7] As noted before, it would

---

[7] Arguably, MSOP's channel restrictions is most analogous to the prison telephone policy at issue in *Holloway*, 666 F.3d 1076, because the MSOP is providing the forum of the speech in the form of the cable package subscription. There, the Eighth Circuit upheld the Arkansas Department of Correction's 45% commission on telephone calls. It noted that the Department of Corrections probably had no specific obligation to provide telephone access at all, and agreed with the district court that it was not "clear that the *Turner* framework applies." *Id.* at 1079-1080. Still, and perhaps confusingly, it then concluded that "[t]he district court properly conducted a *Turner* review" and discussed why the inmate's challenge failed under *Turner*. *Id.* at 1080-81. The upshot of *Holloway* is that the *Turner* analysis is likely necessary, even when a government actor is under no obligation to provide the particular forum.

be imprudent to conclude on the current record, and without binding precedent to guide it, whether Plaintiffs maintain any First Amendment right they may have to view the television given their civil commitment status. Because Plaintiffs have stated a cognizable First Amendment claim, it survives this 12(b)(6) motion despite their civil commitment status.

## IV.   Banks's Prior Litigation and Res Judicata

Although the Complaint states two cognizable claims under the First Amendment, both are claims that Banks has brought in prior litigation, and as such he is barred from re-litigating them under the principles of res judicata, or claim preclusion. In 2011, Banks brought a lawsuit challenging, among other things, MSOP's practices of blocking certain television channels from the cable package and prohibiting residents from using the internet or email. *See Banks*, 2016 WL 3566207, at *9; *Banks*, 2011 WL 6292133, at *1-2.

Both claims in the present suit are claims that Banks brought or could have brought in that prior litigation, and as such he is barred from re-litigating them under the principles of res judicata, or claim preclusion. Res judicata "bars a claim if: '(1) the first suit resulted in a final judgment on the merits; (2) the first suit was based on proper jurisdiction; (3) both suits involve the same parties (or those in privity with them); and (4) both suits are based upon the same claims or causes of action.'" *Clark v. Callahan*, 587 F. App'x 1000, 1001-02 (8th Cir. 2014) (quoting *Costner v. URS Consultants, Inc.*, 153 F.3d 667, 673 (8th Cir. 1998)). The parties do not dispute that Banks's prior lawsuit, in which the television claim was dismissed with prejudice for failure to state a claim and the internet claim was dismissed on summary judgment, satisfies these elements. Indeed, Plaintiffs

concede that Banks should be dismissed as a Plaintiff on Count 2 (regarding television channels). Pl.'s Response to Def.'s Mot. Dismiss 18, Docket No. 32.

As to Count 1, Ivey and Banks assert that the law in this area has so dramatically shifted as to nullify any otherwise applicable res judicata effect of the prior lawsuit. Pl.'s Response 16. Specifically, they point to *Packingham*, 137 S.Ct. 1730, as establishing "a newly broader First Amendment right to internet access which did not exist when Plaintiff Banks filed his previous claim . . . ." *Id.* at 15-16. This argument overreads *Packingham* and ignores the law that existed before it.

Generally, the res judicata consequences of a prior case is not "altered by the fact that the judgment may have been wrong or rested on a legal principle subsequently overruled in another case." *Federated Dept. Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981). The Supreme Court has warned that the purpose of res judicate "serves vital public interests beyond any individual judge's ad hoc determination of the equites[,]" and that there "is simply 'no principle of law or equity which sanctions the rejection by a federal court of the salutary principle of res judicata.'" *Id.* at 401 (quoting *Heiser v. Woodruff*, 327 U.S. 726, 733 (1946)). Offering precedent from other circuits, Plaintiffs identify an exception to *res judicata* when "moment[o]us changes in important, fundamental constitutional rights" have occurred. *Precision Air Parts, Inc. v. Avco Corp.*, 736 F.2d 1499, 1504 (11th Cir. 1984). This Court need not determine whether this *res judicata* exception found in other circuits exists—or ought to exist—in the Eighth Circuit, as *Packingham* is not the momentous shift that Plaintiffs contend it is.

As a general matter, the underlying principles applied in *Packingham* were never in dispute, and the case represents no momentous change in the law. As early as 1997,

the Supreme Court had concluded that the nature of the internet "provide[s] no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium." *Reno*, 521 U.S. at 870. So, when Banks filed his case in 2011, it was already recognized that speech available on the internet was protected by the First Amendment. *Packingham* merely applied these principles, including the well-known intermediate scrutiny standard for content neutral regulations, and found a particular regulation overbroad. The majority opinion is replete with dicta—"undisciplined," in the concurring justices' view—that espouses the import of the internet in the modern age and comparing the medium to the modern public square. All perhaps true words, but none that represent a fundamental shift in the law itself.

To recognize the absence of a momentous shift in *Packingham*, one need only note how frequently Justice Kennedy's majority opinion there borrows from Justice Stevens's majority opinion in *Reno*, which predates *Packingham* by over 20 years. It is *Reno* the *Packingham* majority quotes for the poetic proposition that websites "allow a person with an internet connection to 'become a town crier with a voice that resonates farther than it could from any soapbox.'" *Packingham*, 137 S. Ct. at 1737 (quoting *Reno*, 521 U.S. at 870). And the majority relies upon *Reno* when it states that social media "offers 'relatively unlimited, low-cost capacity for communications of all kinds[,]'" and thus may be used "to engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.'" *Id.* at 1735-36 (quoting *Reno*, 521 U.S. at 868, 870). In short, *Packingham* merely doubles down on a conclusion the Court had reached two decades earlier. Because there is no reason to disturb the otherwise sound application of res judicata, Banks is dismissed from this action.

**V.       Qualified Immunity**

One last issue remains. Although Ivey may proceed on his First Amendment

claims, he may not do so against Johnston in her individual capacity. "The doctrine of

qualified immunity protects government officials 'from liability for civil damages insofar as

their conduct does not violate clearly established statutory or constitutional rights of which

a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)

(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Because qualified immunity is

more than a defense to liability, creating "a limited entitlement not to stand trial or face the

other burdens of litigation," *Iqbal*, 556 U.S. at 671, courts should, when possible, decide

the issue of qualified immunity before discovery commences. *Kulkay v. Roy*, 847 F.2d

637, 646 (8th Cir. 2017).

A defendant asserting qualified immunity in a 12(b)(6) motion "must show that [she

is] entitled to qualified immunity on the face of the complaint." *Id.* at 642 (quoting *Carter*

*v. Huterson*, 831 F.3d 1104, 1107 (8th Cir. 2016)). That is, she must show that the plaintiff

failed to plead "facts showing (1) that the official violated a statutory or constitutional right,

and (2) that the right was 'clearly established' at the time of the challenged conduct."

*Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). This Court may pick which prong of this

two-part analysis it will address first. *Pearson*, 555 U.S. at 236-43 (overruling its prior

holding in *Saucier v. Katz*, 533 U.S. 194 (2001), which mandated the order of operation

for the qualified immunity analysis). Although Ivey has pleaded a plausible constitutional

violation, he has not shown that Johnston's alleged conduct violates a clearly established

right. "A Government official's conduct violates clearly established law when, at the time

of the challenged conduct, the contours of a right are sufficiently clear that every

reasonable official would have understood that what he is doing violates that right." *Id.* at 741 (cleaned up). There need not be a case directly on point, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*

Ivey again hangs his hat on *Packingham* to show that his rights at issue here have been clearly established, at least since June 19, 2017, thus undermining Johnston's reliance on prior rulings in this District. As noted above, *Packingham* re-affirms that government conduct which prevents someone from accessing a "place" (i.e., the internet) where one may wish to engage in speech raises a genuine First Amendment issue. *Packingham*, 137 S.Ct. at 1739 (Alito, J., concurring).

It does not follow that *Packingham* clearly answers the more precise constitutional question this case presents: do Johnston's policies violate Ivey's rights given his civil commitment status?[8] Ivey's civil commitment status is crucial, as it provides the "contours" and context for the right at issue. Because Ivey is civilly committed, his "liberty interests are considerably less than those held by members of a free society." *Senty-Haugen*, 462 F.3d at 886. As discussed above, courts in this District have adopted a modified version of the *Turner* test, used in prisoner civil rights cases, to determine the scope of Plaintiffs' civil rights that are consistent with their involuntary commitment. *See supra*, 11-12. In considering qualified immunity in the analogous prison context, the Eighth Circuit has

---

[8] If *Packingham* did sufficiently answer this question, Ivey is correct that Johnston's argument would otherwise miss the mark, as it commits the logical fallacy of begging the question. Johnston relies upon her prior argument that "Plaintiffs have no constitutional right to use the internet or watch television" to conclude that no "reasonable person would have known of any clearly established law" giving Plaintiffs the rights at issue. Def.'s Mem. L. Supp. Mot. Dismiss 14, Docket No. 20. In other words, Johnston attempts to argue that, assuming she violated Plaintiffs' rights, the rights were not clearly established— because Plaintiffs do not have the rights she violated.

asked, not whether the general right at issue is clearly established, but whether it is clearly established that the inmate retains that right. *See Story v. Foote*, 782 F.3d 968, 970-71 (8th Cir. 2015) ("The Supreme Court never has resolved whether convicted inmates retain a Fourth Amendment right against unreasonable searches while in custody."). Even assuming that, no later than *Packingham*, a general First Amendment interest in internet speech was clearly established, Ivey offers no case clearly establishing that he retains that right after being civilly committed. That Ivey, like Packingham, are no longer subject to the supervision of the criminal justice system matters little: Ivey's involuntary commitment as a dangerous person limits his rights in ways that Packingham's were not. So, although Ivey has stated a claim under § 1983 for violation of his First Amendment rights, those rights are not so clearly established that Johnston may be held individually liable for money damages. Ivey's claims against Johnston in her individual capacity are dismissed.

## VI. Conclusion

Defendant Johnston's Motion to Dismiss is granted in part. Plaintiff Banks is dismissed as a party in this action because he brought the same claims in a prior lawsuit. As to Plaintiff Ivey, his claims under the Minnesota state constitution are barred by the Eleventh Amendment and are dismissed; his claims for damages against Johnston in her individual capacity are dismissed because Johnston is entitled to qualified immunity.

However, to the extent Ivey seeks injunctive and declaratory relief, both of his § 1983 claims for violation of his First Amendment right to free speech may proceed against Johnston in her official capacity.

**RECOMMENDAITON**

For the foregoing reasons, the Court RECOMMENDS THAT:

1.      Defendant's Motion to Dismiss Plaintiffs' Complaint [Docket No. 18] be GRANTED IN PART AND DENIED IN PART.

2.      To the extent Plaintiffs' claims arise under the Minnesota state constitution, those claims be DISMISSED.

3.      Plaintiff Banks be DISMISSED as a plaintiff in this action.

4.      All claims against Defendant Johnston in her personal capacity be DISMISSED.

5.      Defendant Johnston's Motion to Dismiss [Docket No. 18] be DENIED in all other respects.

Dated: July 24, 2019

s/David T. Schultz_____
DAVID T. SCHULTZ
United States Magistrate Judge

**NOTICE**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).